98 N.J. Super. 306 (1967)
237 A.2d 289
REPSIE J. SNEED, INDIVIDUALLY, ETC., PLAINTIFF-RESPONDENT,
v.
CONCORD INSURANCE COMPANY, DEFENDANT-RESPONDENT, AND CONSTANCE RABER, AN INFANT BY HER GUARDIAN AD LITEM, LEO RABER, HER HUSBAND, AND LEO RABER, INDIVIDUALLY, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 23, 1967.
Decided December 19, 1967.
*309 Before Judges CONFORD, COLLESTER and LABRECQUE.
Mr. Daniel D. Richards for appellants (Messrs. Richards & DeMiro, attorneys; Mr. Nicholas A. DeMiro, on the brief).
Mr. Charles M. Judge for respondent Repsie J. Sneed.
Mr. Vincent D. Enright, Jr. for respondent Concord Insurance Company (Messrs. Harth & Enright, attorneys).
The opinion of the court was delivered by CONFORD, S.J.A.D.
This is a declaratory judgment action brought by the administrator of the estate of Rosa Sneed, claimed to be an additional insured under an automobile liability policy issued by defendant Concord Insurance Co. ("Concord" hereinafter) to plaintiff individually, to establish the insured's right to coverage under the policy in respect of an accident occurring May 15, 1963 involving plaintiff's automobile while driven by Rosa and that of the defendants Raber, in which the Rabers were injured. The Chancery Division decided, adversely to the position jointly taken by plaintiff and the Rabers, that (1) Concord's liability on the policy, insofar as Rosa's liability to the Rabers was concerned, was abated by reason of the fact that she had no driver's license on the date of the accident, and (2) Concord *310 was not barred from asserting its immunity by reason of the doctrines of waiver or estoppel. The Rabers appeal as derivative claimants in the Sneeds' right. Whittle v. Associated Indemnity Corp., 130 N.J.L. 576, 578 (E. & A. 1943). Plaintiff joins in their position.
The material facts are as follows.
Concord issued to plaintiff Repsie J. Sneed a standard automobile liability policy with bodily injury limits of $10,000-$20,000 for the period of one year from March 28, 1963. The policy provided: "The following persons, provided they are duly licensed to operate an automobile, are insureds as to liability: (1) the named insured and if an individual, the spouse if resident in the same household; * * *." (Emphasis ours)
Although Rosa Sneed was a member of Repsie's household on May 15, 1963, her driver's license had expired April 30, 1963 and was not renewed until May 17, 1963. Why this was so the record before us does not reveal. Rosa died July 19, 1963 of a heart attack unconnected with the accident. Both Leo Raber and his wife Constance (to whom he was not yet married at the time of the accident) suffered personal injuries in that occurrence, the latter's apparently the more serious. Concord was informed of the accident May 20, 1963. Two weeks later it attempted, unsuccessfully, to effectuate a settlement of Leo's claim. However, in July 1963 it reached agreement with him through one Flannery, an independent adjuster, and consummated the settlement on August 2, 1963 for $450. In July Flannery was also trying to settle Constance's claim with her father but they could not come to terms. Although Concord knew on August 2, 1963 that Rosa was unlicensed at the time of the accident, it chose to go through with the previous agreement with Leo Raber "as cheaper and more practical for us."
Concord's preliminary investigation of the accident did not apprise it of the fact that Rosa had lacked a driver's license at the time of the accident, but it learned this on August 1, 1963. It wrote that day to the Sneeds of this *311 discovery and informed them, over signature of Thomas A. Glasser, chief claims examiner:
"Paragraph IV of your insurance contract with this company provides that coverage is afforded for certain persons `duly licensed to operate an automobile.' Since Rosa B. Sneed was operating the vehicle involved in the accident at a time when she was not duly authorized to operate same, this is tantamount to a breach of the policy contract and, therefore, the CONCORD INSURANCE COMPANY will continue to investigate this matter, but reserves any and all of its rights under the policy contract and may at any time, disclaim liability thereunder."
The letter contained no language apprising the policy-holders that they were at liberty to accept or reject the company's plan of procedure.
Repsie testified he could not recall having received the foregoing letter, but the trial court found he did, and we accept that finding. Repsie wrote to Concord under date of August 2, 1963, attention of Glasser, the following letter, which bears all the earmarks of a reply to Concord's letter of August 1:
"Dear Sir:
My wife, Rosa B. Sneed is dead. She died on the morning of July 19, 1963. Therefore it is not possible for me ascertain if her license was valid or if she had sent for it before the accident. These factors, I am sorry but I can not answer."
Sneed sent another letter to Concord of similar purport the same day, attention of John M. Wilson, claims adjuster.
Leo Raber testified that on a number of occasions throughout 1964 he communicated with Flannery to inquire about settlement of Constance's claim. Flannery on one occasion asked what the Rabers would take and was told $3,000. On each occasion Flannery told Raber he would have to inquire of Concord, but he never gave Raber an answer. The last such conversation was in February 1965, when Raber said he would soon have to engage a lawyer as the two-year period of limitations was running out. Flannery broke off the negotiations, saying, "Don't threaten me with a lawyer," *312 so the Rabers engaged counsel and instituted suit against Sneed April 27, 1965.
Concord's claim manager, Roberts, testified the company did nothing about investigating the Rabers' claims after August 1, 1963. It had no further communication with Sneed until it disclaimed in June 1965, nor did it turn over to Sneed any of its records as to the investigation. Flannery had no authority to do anything after he settled Leo's claim, but the company never advised either Sneed or the Rabers of that fact. Flannery did not testify.
When Sneed turned over the suit papers to Concord in June 1965 he was informed by the company's letter of June 14, 1965 that it was disclaiming liability "by reason of the breach of the policy conditions" constituted by Rosa's being without a license on May 15, 1963, and that it would not defend the Raber action.

I
The first question for decision is whether Rosa's lack of a license on May 15, 1963 abated the coverage of the policy in respect of this accident. We think the decision of the trial court on this phase of the litigation was correct. The meaning of the policy language is not subject to fair doubt. Rosa Sneed's coverage as an insured driver under the policy was expressly conditioned upon her being "duly licensed to operate an automobile," and she was indubitably not so licensed on the day of the accident.
Appellants contend this was merely a "technical violation" and that since Rosa's competence as a driver could not be said to have been less between April 30 and May 17, 1963, the period when her license was lapsed, than before and after those dates, the fact of lapse of license as of May 15, 1963 did not pertain to a hazard of the insurer's undertaking and should not, as a matter of public policy, avert its liability. We do not agree. Generically, the exclusion was of a type that does have broad relevance to the carrier's risk, *313 and no line can be drawn between long and short periods of nonlicensure when the insurance policy is as plain as this one. Universal Indemnity Ins. Co. v. North Shore Delivery Co., 100 F.2d 618 (7 Cir. 1938), certiorari denied 306 U.S. 658, 59 S.Ct. 775, 83 L.Ed. 1055 (1939). See Zabonick v. Ralston, 272 Mich. 247, 261 N.W. 316, 318 (Sup. Ct. 1935); Giacomo v. State Farm Mut. Automobile Ins. Co., 203 Minn. 185, 280 N.W. 653 (Sup. Ct. 1938); State Farm Mut. Automobile Ins. Co. v. Belshe, 195 Ark. 460, 112 S.W.2d 954 (Sup. Ct. 1938); Holland Supply Corp. v. State Farm Mut. Automobile Ins. Co., 166 Va. 331, 186 S.E. 56 (Sup. Ct. App. 1936). To be distinguished is a holding (somewhat obscure) that a policy requirement that the operator be "legally operating" the car will not justify denial of coverage by reason of the driver's not being licensed in this State, where none of the numerous policy exclusions specify operation by an unlicensed driver. Osborn v. New Amsterdam Casualty Co., 111 N.J.L. 358 (E. & A. 1933).
Only one decision supports appellants' position. McMahon v. Pearlman, 242 Mass. 367, 136 N.E. 154, 23 A.L.R. 1467 (Sup. Jud. Ct. 1922). The majority view is to the contrary, and we are of the firm opinion that the policy language must be held to sustain Concord's position whether the clause in question is regarded as germane to termination of coverage, as such, or as a contract condition precedent breached by the operator of the vehicle. See Whittle v. Associated Indemnity Corp., supra.
Finally under this point, we reject as frivolous the contention that to sustain this exclusion would be to violate the public policy of this State allegedly expressed in a directive of the Commissioner of Banking and Insurance dated August 22, 1966, restricting "exclusionary clauses or indorsements" to two specified categories. As indicated above, the policy here in question was issued in 1963. We are not called upon to express any opinion as to the effect of the directive in any other context.

*314 II
A much more substantial question is raised by appellants' contention that the trial court erred in holding that Concord was not estopped to raise the coverage question.
In the first place, the trial court assumed, apparently because the issue was not raised by appellants, that the so-called reservation letter from Concord to the Sneeds of August 1, 1963 constituted an effective nonwaiver agreement. Notwithstanding that the point is not squarely raised in appellants' brief, this court, deeming its consideration essential to a just determination of the case, raised it at oral argument and received argument thereon at that time and in supplemental memoranda.
Merchants Ind. Corp. v. Eggleston, 37 N.J. 114 (1962), makes it clear that the letter mentioned does not constitute a valid nonwaiver agreement. Such an agreement requires the consent of the insured, as he gives up valuable rights in respect of control of investigation and negotiations for settlement as well as, later, of the defense of any action instituted by the claimant. (At p. 127). While an agreement may be inferred from an insured's failure to reject an offer to control the defense and at the same time reserve a right to dispute liability, yet "to spell out acquiescence by silence the letter must fairly inform the insured that the offer may be accepted or rejected." (At pp. 127-128). There is no question but that Concord's letter of August 1, 1963 was not an offer at all, but a unilateral declaration of its intention to control the investigation and, impliedly, the entire handling of the claim, while reserving the right to disclaim whenever it saw fit to do so. Certainly the letter did not apprise Sneed that he was free to accept or reject Concord's intended course of action. Roberts' testimony makes the position of Concord clear:
"Q. Did you ask in the letter to Mr. Sneed to consent to this reservation of rights?
A. We don't have to ask a man to consent to our reservation of rights. That's our right. We just notify that we are."
*315 Sneed's responses to the letter make it plain that he neither understood that he was being asked whether he would consent to a proposal nor in fact was so consenting. He thought he was being asked for information as to whether his wife was licensed on May 15, 1963, and he said he did not know, as she was dead.
Concord does not argue that Sneed consented to the reservation in the letter. Its contention is solely that such consent is not necessary unless the company is proposing to control the defense of the action, as distinguished from control of the handling of the claim prior to action, and it asserts its letter did not go to defense of the action. We do not agree with either proposition for reasons to be stated hereinafter.
We thus must hold there was no effective nonwaiver agreement. The question as to whether what happened on and after August 1, 1963, when Concord learned of Rosa Sneed's license status for the first time, constituted a waiver of or estoppel against its right to repudiate liability on the policy in respect of the May 15, 1963 accident must consequently be approached on the hypothesis that Concord's conduct in the matter on and after August 1, 1963 did not have Sneed's approval or consent, but was compulsorily acquiesced in by him by virtue of Concord's retention of right of exclusive control of the handling of all aspects of the claim under other policy clauses. The statement in Concord's brief that upon the insured's receipt of its August 1, 1963 letter he "was free to engage counsel" is totally unwarranted if it implies that the insured was free to investigate the claim or negotiate for settlement on his own, with or without counsel, let alone defend any action instituted by the Rabers. The letter was a clear signal that the company was maintaining its exclusive rights under the policy in those respects until such indeterminate time as it might choose to disclaim any liability on the policy.
Thus, the real issue on this phase of the appeal is whether without an effective nonwaiver agreement the insurer is *316 nevertheless free to appropriate total control of the claim short of actually participating in the defense of an action instituted on the claim, without being barred from asserting nonliability by waiver or estoppel unless the insured can affirmatively show prejudice in fact. That the bar would arise on the basis of presumptive prejudice if the company participated in a defense of an action on the claim is clear. O'Dowd v. United States Fidelity & Guaranty Co., 117 N.J.L. 444, 451-52 (E. & A. 1937), and other cases cited in Merchants Ind. Corp. v. Eggleston, supra (37 N.J., at p. 129). As to the situation where disclaimer by the company precedes institution of action on the claim against the insured, the general tenor of the opinion in Reliable Newspaper Delivery Inc. v. Maryland Casualty Co., 131 N.J.L. 424 (E. & A. 1944), is that prejudice in fact must be demonstrated by the insured. There estoppel was ruled out on the express ground of failure of the insured to show prejudice in a situation where the handling of the claim had been controlled by the insurer for ten months but disclaimer took place a year prior to suit by the third-party claimant.
We need not determine whether the trial court was correct in its holding that there was no showing of prejudice to the Sneeds, since we are convinced that, although the Supreme Court found it unnecessary to so expressly declare in the Eggleston case, supra, the entire philosophy and tenor of that opinion is out of harmony with the determination in Reliable Newspaper Delivery, supra, relied upon by the trial court, that the insured must show prejudice in fact even though full control over the claim is exercised by the insurer for a substantial period of time after its apprisal of the facts grounding assertion of noncoverage of the policy and before its declaration of disclaimer.
Careful analysis of Eggleston is required. The first phase of the opinion concerned the question whether the insured practiced fraud on the carrier in the inception of the contract. This does not concern us here. The determinative holding of the Supreme Court was that the insurer waived the fraud *317 because, without a reservation of right to disclaim, it had not disclaimed until nine months after it knew the facts relative to the asserted fraud (when it filed a declaratory judgment action) and in the meantime had by its attorney filed an answer to the damage suit as well as a third-party complaint and also participated in discovery proceedings. This conduct constituted a binding election to affirm the policy and effected a waiver of the defense of fraud against the insured. 37 N.J., at pp. 131-132.
The court distinguished between disclaimer for fraud or breach of contract, in which case the insured must show waiver, and for noncoverage, where the insured's avoidance would be based on estoppel. The strong import of the discussion relative to estoppel is that appropriation of control over the claim by the insurer establishes prejudice to the insured as a matter of law, "doubtless because, since the course cannot be rerun * * * it [is] futile to attempt to prove or to disprove that the insured would have fared better on his own." 37 N.J., at p. 129.[1] While the court recognized that a different approach was reflected in Reliable Newspaper Delivery Inc. v. Maryland Casualty Co., supra (a non-coverage situation), and that the court there (which divided 11-5) possibly had in mind "a distinction between investigation and defense of a suit," the distinction did not require appraisal because the insurer in Eggleston did undertake to defend the suit and also because the question there concerned waiver rather than estoppel. (At p. 130).
But a reading of the whole opinion in Eggleston demonstrates that (1) the factors regarded as giving rise to waiver are strongly akin, because of their reflection of concern with the posture of insureds, to those which spell out prejudice to *318 the insured as a matter of law in the area of estoppel, and (2) the rationale of the opinion fairly augurs an ultimate view that the insurer's taking over of control of investigation and negotiations for settlement of the claim, and consequent exclusion of the insured therefrom, for a substantial period of time, invades valuable rights of the insured and should evoke a presumption of prejudice even as where the insurer assumes defense of the claim.
In the first place, the court's discussion of an effective nonwaiver agreement assumes that the requirement therefor is applicable whether the carrier's reserved disclaimer is for breach of contract or noncoverage. Second, the development of the reasons for the requirement that a nonwaiver agreement be with the consent of the insured emphasizes that the insured thereby gives up significant rights in respect of control of the claim against him prior to as well as after the claimant's action is begun. The court said:
"Carriers contract for control, and to that end require notice of accident and prompt submission of suit papers. Success, absolute or relative, may depend upon skill in investigation, in negotiations for settlement, and in the conduct of the lawsuit. Just as a carrier would hardly agree to pay a judgment after defense by the insured, so it cannot expect the insured to pay for a judgment when it controlled the litigation. A carrier may be more confident of its handling of claims, but an insured may with equal conviction prefer the individualized attention of his own counsel as against the services furnished by an insurer in the mass-handling of litigation. Personal counsel may seize opportunities to settle which might be ignored or overlooked by a carrier to which the case is just one of a great number. Moreovor, whatever his estimate of lawyers in general, a man usually has faith in `my lawyer.' This intangible is a valuable right.
For these reasons it would be unfair to permit a carrier to control the defense without the consent of the insured and then leave the judgment for his payment." (37 N.J., at p. 127; emphasis ours)
It is clear to us from the foregoing that the general references throughout the Eggleston opinion to "control of the defense" are intended to have reference to control of any significant phase of the handling of or resistance to the *319 claim, whether prior or subsequent to institution of action by the injured claimant.
So, too, in discussing the factors relevant to waiver determinative of whether an insurer has made timely rescission of the insurance agreement on grounds of the insured's fraud or breach of contract, the court said:
"In short, if a carrier receives information suggesting fraud or breach of contract, it must seek the facts with reasonable diligence, and having acquired them it must within a reasonable period decide whether to continue to perform. What is a reasonable time depends upon the circumstances. In the case of a liability policy, an important circumstance is that the one who is to pay should have an early opportunity to investigate the outstanding claim of the third party." (at p. 131; emphasis ours.)
The only state which seems to make the distinction in favor of insurers that the disclaimer preceded and was without any defense of the claimant's action is Minnesota. See Security Ins. Co. v. Jay, 109 F. Supp. 87 (U.S.D.C. Minn. 1952). But the import of National Union Ins. Co. of Pittsburgh, Pa. v. Bruecks, 179 Neb. 642, 139 N.W.2d 821 (Sup. Ct. 1966), and Security Ins. Co. of New Haven v. White, 236 F.2d 215 (10 Cir. 1958) is to the contrary. In both cases estoppel was found and prejudice presumed on the basis of exercise of control over the claim by the insurer short of undertaking defense of an action.
No sensible reason for the distinction suggests itself in principle. The difference is one of degree of invasion of the insured's rights, not of kind. Any invasion, if substantial, should suffice without the need for particularized establishment of prejudice. The period of time after the accident which ensues while control is being maintained by the insurer is logically important, as relevant evidence of surrounding circumstances may become faded by the passage of time. Further, a claimant may be more willing to settle in the early stages, when he is perhaps (as here) unrepresented, than later.
*320 In any event, as indicated above, we are satisfied that Eggleston adumbrates the principle that without an effective nonwaiver agreement an insurer who exercises its policy right exclusively to control the handling of a claim against its insured for a substantial period after it knows it has a basis for denial of coverage will be estopped thereafter to disclaim liability on the policy. Prejudice to the insured will be assumed because the "course cannot be rerun" so as to determine whether the insured would in fact have fared better on his own if the insurer had disclaimed promptly.
Here there was a maintenance of exclusive control over the Rabers' claim by the insurer for 22 months after notice to it of the facts concerning Rosa Sneed's status as to licensing. It is irrelevant what Sneed would or could have done had Concord not signalled to him by the August 1, 1963 letter that it was going forward with the investigation. He could not have intermeddled with the matter without risking forfeiture of coverage by the company for breach of other policy conditions. Thereafter Concord concluded its settlement of Leo's claim, and its representative had discussions with Leo in relation to Constance's claim over a period of almost a year and a half. Concord never, prior to June 1965, lifted the restraint against Sneed's participating in the matter. This constituted substantial exclusion of Sneed's participation in control over and defense of the claim under color of the insurer's right to exclusive control under the policy, and since this was done without Sneed's consent to the attempted reservation of right of disclaimer, it spells out a complete estoppel against Concord under our view of the presently controlling law in this State.
One last word in relation to the trial court's comments in ruling that the Rabers might not take advantage of any prejudice sustained by Sneed as a result of Concord's actions. Concord does not make this point on the appeal, and we regard it as without merit. The Rabers' rights vis-a-vis Concord are exactly the same as Sneed's, "no greater and no less." Whittle v. Associated Indemnity Corp., supra, 130 *321 N.J.L., at p. 578. If Concord is estopped to disclaim as against Sneed, whatever the reason, and is consequently bound to him on the policy as administrator of Rosa's estate, it is equally bound as to the Rabers who stand in the Sneeds' shoes. See also 29A Am. Jur., Insurance, § 1491, p. 601. This conclusion also subserves the strong public policy in this State favoring the availability to injured persons of the liability insurance of those whose negligence is the cause of their plight. See Matits v. Nationwide Mutual Ins. Co., 33 N.J. 488, 495-496 (1960); Selected Risks Insurance Co. v. Zullo, 48 N.J. 362 (1966).
Judgment reversed; no costs.
NOTES
[1] Contrast this approach with the court's statement in Reliable Newspaper Delivery Inc. v. Maryland Casualty Co., supra, 131 N.J.L., at p. 426, that the insured was benefited by the insurer's investigation, that the insured had a year after disclaimer to prepare its case "and there was no showing that [insured] could have done anything that it did not do."